CULPEPPER, Judge.
Cecil B. Gremillion, a realtor, filed this suit against Dr. Shelly Mouledous for payment of commissions due under a real estate listing agreement. In particular, plaintiff seeks a commission of 5% of all royalties received by defendant during the entire term of an oil, gas and mineral lease procured by plaintiff for defendant. Defendant answered, alleging that under the agreement no commissions are due on royalties received after the two-year term of the listing agreement. Defendant later filed a reconventional demand to recover two commission payments of $1,200 each, allegedly made in error for delay rentals received after the listing agreement expired. The trial court ordered defendant to pay the commissions sought and denied the reconventional demand. Defendant appealed.
The listing agreement is ambiguous. The issue is whether the parties intended that the plaintiff receive a commission of 5% of the royalties received by the landowner after the two-year term of the agreement expired.
Plaintiff is a licensed real estate broker in Vermilion Parish. Defendant owns various tracts of land in that parish. In early 1970, plaintiff approached defendant concerning the possibility of his handling the defendant’s property. One of the tracts mentioned was a 320-acre tract of marshland near Pecan Island in Vermilion Parish.
In 1968, defendant had unsuccessfully attempted to negotiate with Humble Oil & Refining Company an oil and gas lease on this property. Humble offered $50 per acre delay rentals, a 1,4th royalty, and no bonus payments. Defendant rejected this offer. Defendant informed the plaintiff that he was still interested in attempting to secure an oil, gas and mineral lease. He told the plaintiff that such a lease providing for $75 per acre delay rentals, a 1,4th royalty, and a $24,000 bonus payment would be acceptable to him.
In the course of their negotiations, the parties agreed that a real estate listing agreement would be executed by them.
There is a substantial factual question as to which party suggested that Marcus Broussard, Jr., an Abbeville attorney, prepare the listing agreement. The trial judge found that the plaintiff suggested that Broussard draft the agreement. He also found that Broussard had performed services for both parties on prior occasions; that plaintiff gave the initial instructions and necessary information to Broussard; and that Broussard did not charge either party for his services. The trial court found the testimony of Mr. Broussard to be that he and the defendant had a telephone conversation prior to the signing of the contract concerning the defendant’s right to accept or reject all offers secured by the plaintiff. Though not specifically stated, we must infer that the trial judge concluded that Broussard represented neither party in drafting the listing agreement.
On February 25, 1970, plaintiff and defendant signed the agreement in the defendant’s office. Mr. Broussard was not *899 present. The agreement is in the form of an act under private signature.
After describing the properties to be handled by the plaintiff, including the 320-acre tract in dispute, the agreement contains the following provisions:
“AGENT is given the right to seek and solicit offers for the purchase of all or portions of the above described properties, or for the rental or lease of the same, including, but not limited to minerals, royalties, as well as surface and other sub-surface uses. In consideration of AGENT’S services in this regard, PRINCIPAL binds and obligates himself to pay to AGENT five per cent (5%) of all leases, sales and other agreements accepted by him on any of the lands above described for a period of two years, beginning this date.”
Pursuant to their agreement, plaintiff contacted the Humble representative in Lafayette to see if his company would be interested in a lease of defendant’s property. Plaintiff notified defendant of his negotiations with Humble. Within a few days, a representative of Humble contacted the defendant regarding an oil, gas and mineral lease of the 320-acre tract.
On May 22, 1970, due to plaintiff’s efforts, Humble and the defendant executed an oil, gas and mineral lease providing a primary term of five years, a bonus of $24,000, a i/£th royalty, and delay rentals of $75 per acre.
Defendant paid plaintiff 5% of the bonus, or $ 1,200, and 5% of the delay rentals for 1971, 1972 and 1973, each in the amount of $1,200. When plaintiff learned that production had commenced on the 320-acre tract in May, 1973, he made amicable demand on defendant for 5% of the royalties paid to the defendant. Defendant refused, insisting for the first time that his obligation to pay commissions to plaintiff ceased on February 25, 1972, or two years from the date the listing agreement was signed.
In oral argument before this Court, counsel for- defendant conceded -the listing agreement is ambiguous. The language used is susceptible of either the interpretation urged by plaintiff or that urged by defendant.
When the terms of a written contract are susceptible of more than one interpretation, or where there is uncertainty or ambiguity as to the provisions of the contract, parole evidence is admissible to clarify the ambiguities and to show the intention of the parties, Giamanco v. Fairbanks, 208 So.2d 346 (3rd Cir. 1969); Capizzo v. Traders & General Insurance Company, 191 So.2d 183 (3rd Cir. 1966).
The trial judge considered the parole evidence and reached the following conclusion regarding the intent of the parties :
“More applicable to the present case is LSA-C.C. Art. 1956 which states:
“ ‘When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation.’
“This article has been applied in numerous cases, most of which simply paraphrase the language used in the Civil Code. In Jacka v. Ouachita Parish School Board, 249 La. 223, 186 So.2d 571 (1966), Justice McCaleb stated, ‘It is the cardinal rule, as stated by Article 1956 of the Code, that when the intent of the parties is doubtful, the construction put upon the contract by the parties themselves furnishes the rule for its interpretation.’
“By application of this rule, it is apparent that the parties did not intend that all rights and obligations would terminate on February 25, 1972. It is undisputed that the defendant did, in fact, continue to pay plaintiff 5% of the delay rentals for 1972 and 1973, well beyond *900 the two year period in question. While the defendant now contends that these payments were made in error, and are the subject of a reconventional demand, it is significant that defendant noticed this alleged error only when plaintiff demanded his commission on the royalties, and that for two consecutive years, allegedly outside the term of his obligation, defendant made payments of $1,200.00 per year on the delay rentals without protest. It is my conclusion that the defendant paid $1,200.00 for the years 1972 and 1973, not through error, but because such was his obligation within the intent of the parties. This is the construction the parties have placed on the contract. Such a construction removes from ambiguity the meaning of the two-year period. Defendant’s own action in tendering payment beyond February, 1972 indicates that the two-year period did not limit the time of the parties’ obligations.
“Construing the two-year period as the term of the listing agreement rather than the term of defendant’s obligation finds further support in LSA-C.C. art. 1952 which states, ‘Terms, that present two meanings, must be taken in the sense most congruous to the matter of the contract.’ Applying the concept to transactions other than a mineral lease indicates that plaintiff’s interpretation, rather than defendant’s leads to the more congruous result. For example, according to defendant’s interpretation, if an installment sale with no payments due until after February 25, 1972 were at issue here, presumably, plaintiff would receive no commission. If only a portion was due before February 25, 1972, the commission would be due only on that portion. Yet the language of the contract refers to a percentage of a transaction, namely, a ‘sale, lease, or other agreement.’ Likewise, if plaintiff secured a lessee for defendant’s property on the last “day of the agreement and no rent was paid until after February 25, 1972, defendant’s interpretation would lead to the conclusion that no commission would be due plaintiff. An interpretation which would lead to such incongruous results cannot be accepted, especially when the parties themselves have placed an interpretation on the contract which is logical and does not destroy the internal consistency of the contract.”
The testimony of three real estate experts clearly establishes that the custom in the business is that the realtor’s commission on rentals on leases continues for the full term of the lease, without regard to the term of the listing agreement. For instance, Mr. Dan Richey testified:
“Q How long do they pay you six percent commission, or the commission?
“A During the term of the lease.
“Q Is that payment made beyond the term of the listing agreement?
“A There’s no connection between the listing agreement and the term of the lease. The listing agreement is the time you have to perform your function; you either do it or you don’t do it.”
Mineral royalties paid to the lessor landowner are usually considered to be the same as rent, Melancon v. Texas Co., 230 La. 593, 89 So.2d 135 (1956); LSA-R.S. 31:123 and cases cited under the Comment. Thus, in the present case the production royalties paid to defendant lessor would usually be treated the same as rent under a commercial lease procured by a realtor.
We conclude the parties intended that the realtor receive a commission of 5% of the royalties received by the landowner during the entire term of the oil, gas and mineral lease.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendant appellant.
Affirmed.